Wood *v.* Perry.

SAME TERM. *Before the same Justices.*

WOOD and others *vs.* PERRY and TORREY.

Separate purchasers of different parcels of the same lot cannot join in a bill against the former owner, to restrain the prosecution of separate ejectment suits commenced by him against the complainants.

Nor can they unite in a bill against such former owner, to compel the performance of a prior contract for the sale and purchase of such lot, between the former owner and another person, upon the ground that such prior contract has been assigned to one of the complainants, as well in his own behalf as to protect the interests of his co-complainants; where there is nothing, beyond the averment in the bill, to show that the purchase or transfer of such contract was for the benefit of all the complainants, or was made at their request, or with their assent.

Persons having distinct claims against another, arising upon separate and independent contracts, cannot join in a bill to enforce such claims; where there is no proof of a common interest in the subject matter.

To allow persons having distinct claims against the same individual to maintain a joint suit against him merely because the act of one may, if valid, incidentally prove beneficial to the others, might be productive of great oppression and injustice.

Wood *v.* Perry.

Whenever a tender is made, and is insisted on in the pleadings, the creditor is at least entitled to the amount tendered.

Where the debtor admits a certain amount to be due, by making a tender thereof, it is not a point at issue between the parties, so far as he is concerned; and the creditor is not required to establish the amount by proof.

It is well settled that a written contract may be waived by parol. And after a contract has been thus waived by one of the parties, neither he nor any one acting under him can resuscitate it.

Although courts of equity often give relief where there has been a failure in strictly complying with the terms of a contract, yet that is only done where there is some excuse for such failure. Relief is never granted to a purchaser where the failure has arisen from a determination on his part to abandon the contract, and where the vendor has acquiesced in such abandonment, and has in consequence made an agreement to sell the land to another purchaser, and has put him in possession of the property.

An assignee of a contract takes the same subject to all existing equities in favor of the other party, against the assignor; although such assignee may not have received any notice of them at the time.

A purchaser of land has a right to buy up a prior contract between his vendor and another person for the sale of the land, with a view of extinguishing an outstanding incumbrance, and charging the vendor with the consideration money. But he has no right to procure such contract for the purpose of defeating the title under which he claims, and under which he is in possession of the land. That the law will not, and ought not to, tolerate.

In Equity. This case came before this court on an appeal by the defendant Perry, from a decree of the late vice chancellor of the seventh circuit. The bill was originally filed against Abner Perry, alone, to obtain injunctions against the further prosecution of three actions of ejectment instituted by him, one against the plaintiffs Benney, and one against each of the other plaintiffs, and to compel the performance of a contract between Perry and one Smith D. Mallory, for the sale of lot No. 37 in Savannah, in the county of Wayne, so far as it related to the parts of that lot which were in the possession of the plaintiffs, respectively. The bill averred that Wood had purchased the contract as well in his own behalf as to protect the interest of his co-plaintiffs. It also set forth that Royal Torrey had once had a claim against the premises, which had not been formally extinguished. Perry demurred to the bill on the grounds that it did not set forth any common interest of the plaintiffs in the subject matter in dispute, and that Torrey had

Wood *v*. Perry.

not been made a party. The demurrer was argued before the late assistant vice chancellor of the first circuit; who decided it against Perry, on the first ground, and in his favor on the second. The bill was then amended by making Torrey a party. Perry answered, but the bill was taken as confessed by Torrey. Abner Perry died soon afterwards, and it was agreed by the parties to substitute his widow, Fanny Perry, to whom he had devised the premises in dispute, as a defendant. An order was obtained by the plaintiffs for the examination of Torrey as a witness; and he was examined accordingly. Much other testimony was taken in the cause. The following is a brief summary of the facts; some of which are more particularly detailed in the opinion of the court.

In 1824, Torrey was in possession of the lot, under a contract of sale to him by Fellows & McNab, the then owners, on which contract he had paid them $50. Being unable to comply with the terms of the contract, he induced Perry, who was friendly to him, to take an assignment thereof, and purchase the lot. Perry paid the purchase money and took a deed in fee from the then owners, to himself, for the whole lot. Pursuant to an understanding between Perry and Torrey at the time, they entered into a contract for the sale of the lot by Perry to Torrey. Torrey had built a house on the lot previous to Perry's purchase, and occupied it by his tenant (Dowd) until about the 26th of November, 1834. But he had failed in the performance of his contract, and Perry considered it at an end. On the day last mentioned Perry entered into a written contract with Mallory, called in the proceedings in this suit, "the Mallory contract," by which Perry agreed to convey the lot to Mallory, by a warranty deed, when he should be paid for it as follows, that is to say $2750, payable $200 in one year from such date, and $200 in one year thereafter, which was to be applied first in payment of the interest and then in reducing the principal; and the residue in six annual payments thereafter, with interest. The deed to be executed when the amount due should be reduced to $2000; for which sum a bond and mortgage on the place were to be executed by Mallory.

Wood *v.* Perry.

And until such bond and mortgage should be executed, none of the valuable pine timber should be cut, except such as might be necessary for the buildings on the premises.　Possession was to be given to the purchaser within one month from the date of the contract.　Mallory took partial possession of the dwelling house within that time : but after remaining there three days he relinquished it, and told Dowd, the former tenant, that he might return, as he, Mallory, had abandoned the contract, and should have nothing more to do with it.　Dowd accordingly returned—Mallory assisting him to remove his things back. Nevertheless, Mallory, on the 23d of February, 1835, assigned the contract to one Leonard, for a nominal consideration. Leonard then removed some of his furniture into the house, and Dowd went out.　Leonard's property was soon afterwards moved out, (how, it did not appear,) and he, shortly after that time offered to re-assign the contract to Mallory, saying that he in his turn had abandoned it.　Torrey then put another person in possession, and applied to Perry for another contract.　On the 11th of December, 1835, they made a new contract in writing for the sale of the land by Perry to Torrey for $2857, to be paid on the first days of November, 1839, 1840, and 1841, with interest, to be secured by a mortgage on the premises and on other land of Torrey.　The deed and mortgage to be made out without delay.　No such deed or mortgage have ever been executed.　Torrey was then, and continued thereafter, in possession of the lot.　On the 4th of July, 1838, Perry, in pursuance of an intermediate arrangement between him and Torrey, conveyed 225 acres of the lot to Thompson and Godfrey, in fee, and received from them their bond and mortgage on the same for $1500.　They paid the remainder of the consideration money, amounting to $875, to Torrey, who retained it for his own use.　Torrey remained in the occupancy of the other parts of the lot until he disposed of the same to the plaintiffs.　On the 3d of September, 1838, he made a written agreement with the two Benneys, whereby he contracted to sell and convey to them 68 acres of the remaining part of the lot; the deed to be executed when he should receive $476 and interest as therein

mentioned. They paid him $100 on the same day, and subsequently, three years interest; and the time for paying the residue was extended by Torrey, to the 3d of September, 1844. The $100, and all the interest paid, were retained by Torrey. The Benneys took possession of the 68 acres. Torrey subsesequently sold an undefined portion of the residue of the lot to Wood, with the privilege of occupying the whole for a time, and then to take a deed for 100 acres, or to occupy the whole until he should be paid for his improvements. And after that he sold half an acre to Palmer for $50, with the privilege of taking another half acre on the same terms; and received from him, and retained, the $50. Palmer went into possession of the two half acres. Torrey testified that these contracts with the plaintiffs were subsequently reported to, and approved by, Perry; who promised to execute the necessary conveyances. Perry, however, denies this. And one of the plaintiffs' witnesses, (Thompson,) testified that Perry instructed him to make inquiries on the subject, and not to sanction the contracts unless he, Perry, should be safe for the residue of the money due to him. It seems that he had also become apprehensive that Torrey had obtained the control of the Mallory contract, and he therefore told Thompson that if he found that Torrey intended to make him trouble on that contract, any deed which he should give to Wood must be subject to it. After Thompson had made inquiries, he made such a report to Perry that he refused to execute deeds to the plaintiffs, and subsequently instituted the actions of ejectment for the parts of the lot in their possession.

Leonard, after abandoning the Mallory contract, removed to the state of Ohio. On the 11th of June, 1836, he assigned that contract to one Uriah Roraback, who went to the state of Ohio to obtain it, for $25. This appears to have been for the benefit of himself, William H. Adams, and Mark H. Sibley. Adams and Sibley each made tenders of the money which they supposed to be due on the contract, and offered a mortgage for the remainder, to Perry, and requested him to execute a deed for the lot. He, however, declined to receive the money, and refused to execute a deed. The plaintiffs allege that he then

recognized the existing validity of that contract; but this is denied by the defendant Perry. The substance of the proof on that subject is mentioned in the opinion of the court. The contract was assigned by Roraback to Sibley on the 6th of July, 1836; the consideration mentioned in the assignment is $100. After Thompson had communicated to Wood what Perry had said about this contract, and his refusal to convey to Wood, he (Wood,) applied to Sibley for the purchase of such contract for himself, and as the plaintiffs allege, to protect the other plaintiffs. Sibley conveyed to him by an assignment, dated June 23d, 1843. The consideration expressed in the assignment was one dollar. Sibley testifies that he actually received from Wood $200, but he refused to insert that amount in the assignment, and expressly stipulated that it was to be without recourse to him. It does not appear whether the last assignment was before or after the commencement of the actions of ejectment. On receiving the assignment, and after the commencement of the suits in question, Wood contending that, under the circumstances, he had a right to enforce the Mallory contract, tendered to Perry $606 absolutely, and $200 more if it should be found due, and claimed a deed for all the lot not included in Thompson and Godfrey's purchase. Perry refused, and the plaintiffs thereupon commenced their suit in the court of chancery. The vice chancellor decreed that upon Wood's paying or tendering to the defendant Perry, within twenty days, the sum of $515,37, she should execute a deed to him for all the lot not included in Thompson and Godfrey's purchase; that Torrey should execute a quit-claim deed to Wood for the same premises; that Wood should thereupon convey to his co-plaintiffs the portions of the lot purchased by them, on his being paid the balance due on their contracts; that the defendant Perry, and her representatives, should be perpetually enjoined from further prosecuting the actions of ejectment already instituted, and from commencing any other suit against the plaintiffs or their representatives, for the parts of the lot held by them respectively; and that the defendant Perry should pay the complainants' costs.

*W. H. Seward,* for the complainants.  1. Henry W. Wood has an interest in all the lands mentioned in the bill of complaint, and in each of the parcels thereof, and in the contracts by which the same are held in possession by himself and the other complainants respectively.  2. All the complainants are necessarily and properly complainants in this suit.  3. The bill is not multifarious.  4. Royal Torrey ought not to have been made a party to the bill.  5. The bill shows a good and sufficient cause for relief against the defendants.

*George Rathbun,* for the defendants.  1. The plaintiffs show no common interest in the subject matter of this suit, and are therefore improperly joined.  2. The complainants have failed to prove the case stated in the bill.  The contract with Wood, as proved, is different, in every particular, from that stated in the bill.  3. The Mallory contract was abandoned by him before assignment, and he surrendered the possession of the premises to Perry, who acquiesced in the refusal of Mallory to fulfil his contract, and Perry soon after executed to Torrey a new contract for the whole lot.  The Mallory contract is therefore void.  4. Torrey was interested in the suit, and was incompetent to testify for the plaintiffs.  He is also impeached, and is not entitled to credit.  5. The plaintiffs are not entitled to a specific performance, because they have failed to prove the contracts stated in their bill, and because they have not performed, or offered to perform, on their part.

STRONG, P. J., delivered the opinion of the court.  The objection raised in behalf of the defendant Perry, that there is not a common interest in the plaintiffs in the subject matter of the suit, sufficient to enable them to join in their complaint and prayer for relief, is settled, so far as it relates to the allegations in the bill, by the decision of the assistant vice chancellor of the first circuit on the demurrer.  As there has been no appeal from his decree, the same is conclusive, so far as it goes, upon the parties in this suit.  But that does not preclude Perry from subsequently raising the question of fact, either by plea or an-

swer. She has done so by her answer, and claims the benefit
of the objection, with the like effect as if it had been formally
pleaded. This rendered it incumbent upon the plaintiffs to
prove such common interest. If the question had turned upon
the contracts made between Torrey, either in his own behalf
or as agent for Abner Perry, and the plaintiffs, the objection
would have been fatal. Those contracts, as set forth in the
bill, and so far as the proofs go, were separate and distinct.
Each of them must stand upon its own ground. There was
no connection whatever between them. Mr. Justice Story says,
in his Commentaries on Equity Pleading, "If an estate should
be sold in lots to different persons, the purchasers could not join
in exhibiting one bill against the vendor for a specific perform-
ance; for each party's case would be distinct, and would de-
pend upon its own peculiar circumstances, and therefore there
should be a distinct bill upon each contract." (*Story's Eq. Pl.*
226, § 272.) But the bill, although it sets out each contract
very fully, does not base the plaintiffs' claim for relief upon
them. It sets up a prior contract between Abner Perry and one
Mallory, and claims that the plaintiffs are entitled to the bene-
fit of it, under an assignment of such contract made to the plain-
tiff Wood, "to protect himself and his co-plaintiffs." The as-
sistant vice chancellor says, "The purchase and transfer of that
contract having been made to Wood for the protection, and
thus for the benefit, of all the complainants, they have a com-
mon interest in enforcing it against the defendant." But there
is nothing, beyond the insulated averment in the bill, to show
that the purchase, or transfer, of that contract was for the bene-
fit of all the plaintiffs. There is no proof that either of the
Benneys, or Palmer, ever requested Wood to make the pur-
chase for their protection, or knew that he intended to make it
at all, nor that they contributed or agreed to pay any part of
the purchase money, nor that there was any subsequent agree-
ment between them that it should be for their common benefit,
or that Wood should receive from his co-plaintiffs any part of
the money which he had expended. Nor does it any where
appear that any of the plaintiffs, other than Wood, ever applied

to Perry to give either of them a deed under the Mallory contract, or that they at any time authorized Wood to make such application in their behalf.   On the contrary, Wood made the purchase without any consultation with the others, paid the consideration money out of his own funds, took the assignment in his own name, made a tender with his own money of the balance which he supposed to be due under the contract, and claimed the execution of a deed to himself.   If Wood is entitled to any benefit under the Mallory contract, there is nothing beyond the averment in the bill to show that the other plaintiffs have any right to participate in it.   In this respect, the case differs from *Fellows* v. *Fellows*, (4 *Cowen's Rep.* 682,) and other similar authorities.   There is no proof of any common interest in the subject matter.   To allow persons having distinct claims against the same individual to maintain a joint suit against him, merely because the act of one may, if valid, incidentally prove beneficial to the others who had nothing to do with it, might be productive of great oppression and injustice. We have seen no case which goes to that extent.   The cases have gone far enough, and should not be extended.   It might be difficult for a single individual, however meritorious a defence he might have, to resist a powerful association formed against him.   The complainants having failed to prove a common interest in the subject matter of the suit, the bill should for that cause be dismissed.

But it is not necessary, nor are the court inclined, to base their decision in this case solely upon that ground.   There are others equally fatal to this suit.

The plaintiffs place great reliance upon the testimony of the defendant Torrey, who was examined as a witness for them, under an order of the late vice chancellor of the seventh circuit. The counsel for the defendant Perry contends that Torrey is interested in the event of the suit, and that his interest is in favor of the plaintiffs, and that therefore he is an incompetent witness for them.   The order very properly restricts his examination to any matter in which he is not interested, and makes his testimony subject to all just exceptions.   The effect of the

order is simply to remove the technical objections arising from his being a party to the suit.   Any objections as to competency, which would prevail against any other witness, would be equally effectual against him.   So far as relates to the contracts made by him with the complainants, he has an interest that they should prevail against Perry.   They were made by him as a party.   That is certain, as to the Benneys, and at least probable, as to the others.   If these contracts should be set aside as invalid, from a want of power or interest in him to make them, he would be liable to reimburse to the plaintiffs the moneys which they have paid to him, and also to respond to them in damages; and that, whether the contracts were made by him in his own behalf, or as an unauthorized agent for Perry. If the plaintiffs should fail on the ground that they had not complied with the terms of their respective contracts, that would exonerate Torrey.   But he was not called by them to prove that; nor is it alleged or admitted by them that there was any such failure on their part. · He was called by them, judging from the course of his examination by their counsel, to establish their contracts.   And as to that he was interested, and his testimony is inadmissible.   But it is not necessary to strike it out, in the view which we take of the case.   Then as to his testimony adduced to establish the Mallory contract. ·As that is hostile to the contracts made by him, it would seem as though his interest must be against the party calling him.   There is some reason to suppose, however, that he has an actual interest in the attempt to set up that contract.   He states on his cross-examination, that he asked Roraback to get possession of that contract from Leonard, the first assignee, and told him that it would be worth $25 to him to get it.   It is in evidence that it was in fact assigned to Roraback.   Harrington, one of the defendants' witnesses, testified that he heard Torrey say he had hired a man who lived at Lyons, to go and get the Mallory contract of Leonard; that he (Torrey) had got hold of it, and that it had cost him about twenty dollars.   True, he said he had obtained it as the agent of Perry, and for his benefit; but Torrey denies this in his testimony; and it is evident that,

if he did, it was not so applied.   It appears from the testimony of Gen. Adams, a witness for the plaintiffs, that Torrey and Wood both applièd to him for the purchase of the Mallory contract, when it was held by Roraback for their common interest ; and that at one time, when they made such application, they were both together, and that the assignment was made to Mr. Wood at the suggestion of one or both of them.   It is now brought forward by Wood, who is Torrey's son-in-law, in opposition to Perry's interest.   There is much, besides the affinity of the parties, to show the connection of interests, as to the subject matter of this suit, between Wood and Torrey.   Some work was done upon the house on the place claimed by Wood, after he came there, and he told the workman (Harrington) that Torrey would pay for it.   Harrington also testifies that Wood and Torrey, together, were at the expense of clearing two acres on the same place, called "The White Oak bush pasture." That when Wood came on the place, he said he, with the assistance of Torrey, was going to repair it ; that Torrey was to be at the expense, that is, he was to work there, and Torrey to assist him all he could.   That Torrey agreed with the witness for the lumber to work up in the house.   When he and Wood settled, Wood told the witness that he (Wood) had nothing to do with the cellar.   Torrey said the same, and agreed to pay for it.   Ransom, another witness, testified that he asked Wood to pay for three thousand shingles used on the place after he came there.   Wood refused, and said that he was building for Torrey, and the witness might go to him.   Thompson, a witness introduced by the complainants, testified, on his cross-examination, that Wood said to him, that Torrey had got him on the place and obtained the contract for the express purpose of fighting out the lawsuit with Perry's folks, and paying up the expense ; that at another time Wood said they had made an arrangement to let him out of the affair, or he was going out of it, and George and Charles Torrey (the sons of the defendant Torrey) were going on the place ; and that Wood had also told him that they were to have the place by indemnifying him, or keeping him clear from the costs.   From all this, and

other testimony of similar import, there is strong reason to infer, that Torrey, after having induced Perry to buy the land in question, to befriend him, and then entering into a contract with him to purchase the lands on terms which would indemnify Perry, and after having, at Perry's request, and as his agent, obtained a prior contract which had been adandoned by its proprietor, for a mere song ; and after having, through Perry's indulgence, received and applied to his own use a considerable sum of money which had been obtained through a sale of a part of the premises, turns round upon his benefactor, and sets up this prior contract to prevent him from obtaining, through the residue of the land, a part of the consideration money which Torrey had received and spent.   The evidence is perhaps not sufficient to prove positively that Torrey has a fixed legal interest in setting up the Mallory contract, sufficient to absolutely disqualify him ; and his testimony, as to that, must be retained in the cause.   But under these circumstances, and others strongly affecting his credibility, it ought not to, and cannot, have much weight, if any at all.   It is contended by the plaintiffs, that Torrey, in making the contracts with them, acted as Perry's authorized agent, and not in his own right, claiming under his contract, and that Perry is bound to perform them. Torrey swears that after the sale and conveyances to Thompson and Godfrey, on the 4th of July, 1838, the contract between him and Perry was waived by both of them.   That Perry then requested him to make sale of the residue of the lot, as his agent, but subject to his approval, and to report the sales to him.   That under such authority, he made the several sales to the plaintiffs ; which were in due time reported to, and approved of by, his employer.   If all this were true, Perry would have been bound to comply with the terms of the contracts when duly requested so to do.   But these positions are supported solely by the testimony of Torrey, and are contradicted by himself, and by documentary and oral evidence.   When asked by the defendants' counsel whether he had ever given up all his claim, on the unsold and unconveyed part of the lot, to Perry, he said that he had never talked with him on that subject.

Even if he had concluded to waive his contract, that could not be done without the consent of Perry; and it no where appears that such consent was ever given. But Torrey says, further, that if he had succeeded in subsequently selling all that part of the lot not included in the purchase of Thompson and Godfrey, he was to receive for his own benefit all beyond the amount due to Perry on his contract. If that was so, it was a continuance of such contract, in substance, and certainly would not prove an implied waiver. Neither could a waiver have been of any possible use to either party. But Torrey's acts look strongly the other way. He made the contract with the Benneys in his own name, as principal, and not as agent for any one. By that he agrees to sell and convey to them, by a good and sufficient warranty deed, the sixty-eight acres included in their purchase. He could not certainly convey to them until he had first received a deed from Perry; and he had no right to that, except upon fulfilling his contract. Torrey also received, and confessedly applied to his own use, what was paid by the Benneys, and extended the time for paying the residue. There was no written contract between the plaintiff Palmer and Torrey; nor is there any positive evidence in what character the latter made it. But he received the money paid by Palmer, and it is not proved or alleged that it was paid by him to Perry. Neither was there any written agreement between Torrey and Wood; and there is so much contradiction between the statements in the bill, the testimony of Torrey, and the declarations of Wood, that it is impossible to say what the terms of that agreement were. The whole history of this matter is strong to show the wisdom of that provision of the statute which requires that such agreements should be in writing, and to throw doubts upon the expediency of another provision which allows courts of equity to establish verbal contracts relative to the sales of lands in cases of part performance. If there had been no relaxation, all such contracts would have been in writing. The parties would no more have thought of making verbal agreements for the sale of lands, than they do now of taking oral conveyances. Wood himself told the witness Thompson

Wood *v.* Perry.

that he agreed to pay $3200 for the one hundred acres sold to him—$1700 to Perry, and $1500 on a credit to Torrey. Besides this, it is proved that Torrey cut a considerable quantity of timber from different parts of the land sold to Wood, and it no where appears, nor is it alleged, that he paid the avails to Perry. All these facts go far to show that Torrey, up to and after the time of his sales to the plaintiffs, considered himself as the equitable owner of the land, under his contract with Perry; and that he made such sales with a view of enabling him to fulfil it. If so, and if such sales were not previously authorized or subsequently ratified by Perry, he would not be bound to complete them until all the money due on his contract should be paid. But if Torrey made them in his own right, and subsequently reported them to Perry, and Perry ratified them, and agreed to execute deeds to the purchasers, he would be bound to do so; provided they complied with the terms of the sales. · But if the sales had been made by Torrey as Perry's agent, and, indeed, in whatever character they were made by Torrey, he himself says that they were to be subject to Perry's subsequent approval and ratification. It is supposed that he assented to them by his permitting the purchasers to make valuable improvements upon the parts sold to them with his knowledge, and without objection or explanation. He might have known of, and permitted, such improvements, without intending to execute separate deeds until all the money due to him should be paid. But there is no evidence, beyond Torrey's assertion, that Perry knew any thing about those improvements, although there is much to infer the contrary. He lived in a distant county, was an old infirm man, and was not on the lot after the sale to either of the plaintiffs. The whole of his conversation with Thompson, proved by the plaintiffs, indicates that he knew but little, if any thing, about the sales made by Torrey, or of the acts of either of the purchasers upon the premises sold them. Then, as to his approval of those sales, and his agreement to execute deeds to the plaintiffs, there is no evidence of either, except what is stated by Torrey. On the contrary, Perry's instructions to Thompson, called for by the plaintiffs,

and on a part of which they principally found their claim for relief, clearly indicate that he had not approved of such sales, and would not confirm them, unless he could have the money due to him on his contract with Torrey effectually secured. Indeed, so far as it relates to the contract with Wood, Torrey himself says that Perry declined accepting it until he could see Thompson, and get him to make the requisite inquiries. Thompson said he did make such inquiries at Perry's request, and then, in his behalf, declined making or affirming the contracts. The weight of the evidence is, that Perry never approved of the contracts between Torrey and the plaintiffs, so as to make them obligatory on him. If, therefore, they had founded their prayer for relief upon those contracts, they have not proved that they were entitled to it.

It was said by the counsel for the plaintiffs, on the argument, that Perry took the legal title to the whole lot, subject to the equitable rights of Torrey. If that were so, such equitable rights could not now, if they would, under any circumstances, aid the plaintiffs. They would have been extinguished by, or merged in, the subsequent contract between Perry and Torrey. By that contract, they assumed, each for himself, and admitted in the other, the character of vendor and purchaser of an absolute and unconditional title in fee simple. So far as it related to their own respective claims at the time, they, and their representatives, were thereby precluded from subsequently denying the right of each to make such contract. But the plaintiffs make no claim through such alleged equitable interests, but, in fact, claim in opposition to them. Nor do they now claim the performance of their contracts with Torrey by Perry's representative; nor have they offered, either to Perry before commencing this suit, or to his representative, in their bill, to fulfil the terms of such contracts on their part. Indeed, they repudiate them, and claim under a prior and hostile contract; and upon that claim they must stand or fall. What is said (and much of it unnecessarily) in the pleadings and proofs in reference to the Torrey contracts, was probably with a view to show the equities of the several parties in the whole transaction; and it is

Wood *v.* Perry.

in reference to those equities only, that the court has bestowed any attention upon that branch of the case.

The late vice chancellor of the seventh circuit considered the Mallory contract as still operative and binding, and upon that based his decree. But if that contract had been revived, and rendered binding on the defendant Perry, we think that the decree is erroneous in several particulars.

The decree credits to the complainants the full amount of the consideration money paid by Thompson and Godfrey on their purchase, including that portion retained by Torrey for his own use, and yet makes no provision for their protection. If the Mallory contract be valid, it necessarily annuls the title conveyed to them by Perry, and it is left in the power of Wood to harass them by litigation, if not to avoid their title altogether. If he has the benefit of the purchase, he should be expressly required to perfect it. The decree also directs that the complainants should be entitled to their deeds on payment to the defendant Perry of the sum of $515,37 ; whereas the plaintiff Wood had previously tendered the sum of $606, which the plaintiffs state in their bill they are advised and believe remains unpaid on the Mallory contract. Whenever a tender is made, *and is insisted on in the pleadings,* the creditor is at least entitled to that amount. (*Slack* v. *Brown,* 13 *Wend.* 390. *Birks* v. *Trippet,* 1 *Saund. Rep.* 33, *n.* 2. *Cox* v. *Parry,* 1 *Durn. & East's Rep.* 464.) The rule is founded in good sense. Where the debtor admits that amount to be due, it is not a point at issue between the parties so far as he is concerned, and the creditor is not required to establish it by proof. Neither do we see the propriety of charging the defendant Perry with $875 retained by Torrey. That sum was never in fact received by Abner Perry, nor by Torrey as his agent. Torrey received it in his own right, under the interest acquired by his contract. The most that could be required by the complainants, on setting up the Mallory contract, would be, that there should be a separate valuation of the land sold to Thompson and Godfrey and the other part of the lot, and that Wood should pay to Perry the same proportion of the consideration money of the Mallory

contract which the actual value of the land to be conveyed to him bears to the whole lot. According to the decree, Wood could obtain for the sum of $291,37 property for which he acknowledges in his bill he was to pay $1700, and for which, according to the statement of one of the witnesses, he was to allow $3200. He would have paid in all, to the defendant Perry $515,37, and to Sibley, for the Mallory contract, $200, and he will be entitled to receive from the Benneys $376, being the balance due on their purchase besides the interest, and from Palmer $50, being the balance due on his purchase; while Perry must sustain a dead loss of $875, with interest on that sum from the 4th of July, 1838, the date of the deed to Thompson and Godfrey.

But we do not think the vice chancellor was right in supposing that the Mallory contract was still operative. Mallory himself testifies that he had given up the possession of the land and abandoned that contract, and had written to that effect to Perry. Perry made no objections, but has uniformly expressed his determination not to consider it of any binding force or effect. That a written contract may be waived by parol is well settled. (17 *Ves.* 356. 2 *John. Rep.* 405.) The contract was then dead; nor was it in the power of Mallory or any one acting under him to resuscitate it. (1 *Caines' Rep.* 47. 3 *John. Ca.* 60. 5 *John. Rep.* 87. 9 *Cowen's Rep.* 46. 13 *John. Rep.* 359.) He informed Leonard, both before and at the time of making the assignment to him, that the contract had been given up. Leonard having taken it with a full knowledge of that fact, and from a man who was out of the possession to which he would have been entitled, had it still been operative, acquired no right to enforce it. Roraback, in making the purchase from Leonard, either acted as the agent of Perry, or in hostility to him. If he acted as Perry's agent, then the purchase enured to his benefit, and the subsequent assignment was in fraud of Perry's rights, and could not avail the assignee. But if he acted in hostility to Perry's rights, or made the purchase in his own behalf, there are other fatal objections to his acquiring any rights under it. It had been expressly abandoned by Mallory, and, although

Wood *v.* Perry.

Leonard, when it was first assigned to him, had endeavored to obtain possession of the property, yet, he too had subsequently given it up and abandoned the contract. There had also been a default in making the first payment. By the terms of the contract, Perry was to give a deed when the consideration should be paid as therein mentioned. Two hundred dollars was to be paid within one year from its date. That period expired on the 26th day of November, 1835, and yet that sum had not been paid on the 11th of June, 1836, when the contract was assigned to Roraback. It is true, that courts of equity often give relief where there has been a failure in strictly complying with the terms of a contract. But that is only done where there is some excuse for such failure. Such relief is never granted to a purchaser where the failure has arisen from a determination on his part to abandon the contract, and the vendor has acquiesced in such abandonment, and has in consequence made an agreement to sell the land to another purchaser, and has put him in possession of the property. The prior contract would then be a nullity. It is immaterial whether Roraback, at the time of the assignment to him, was acquainted with these facts or not. An assignee of a contract takes the same subject to all existing equities in favor of the other party against the assignor; although such assignee may not have received any notice of them at the time. (2 *Vesey*, 691, 764. 1 *P. Wms.* 496. 1 *Vesey*, 123. 4 *Vesey, jun.* 21. 2 *John. Ch. Rep.* 401.) But there was enough in this case to charge the assignee with notice. Although the assignor would have been entitled to the possession of the land by the terms of the contract, had it not been waived or abandoned, yet he was notoriously out of possession. Leonard was in fact a resident of another state, where Roraback sought for him. Torrey was then actually in possession under a subsequent contract with Perry. All these circumstances were sufficient to put Roraback upon inquiry, and if he did not choose to make it, he and those claiming under him should be the sufferers, and not the other party. But if Leonard had not in fact abandoned the property, and made default in the performance of one of the

conditions on which he was to be entitled to a deed, yet it was notorious that his claim was contested at the time by a person then in possession. His right was disputed, (and in fact, under the circumstances, pretended,) and he had not been in possession of the premises for the space of a year before the assignment. The circumstances bring it directly within the mischief intended to be prevented by the statute against champerty and maintenance, (2 *R. S.* 691, § 6,) and strongly illustrate the wisdom of its provisions. Had the contract remained in the possession of either Mallory or Leonard, there would have been no difficulty; but the transfer of it gave rise to an immediate controversy, and has subsequently been productive of a long, vexatious, and expensive litigation.

The assignment to Mr. Sibley is liable to the same, if not stronger objections. It was made after the two unsuccessful attempts, one by himself, and the other by Gen. Adams, to induce Perry to acknowledge the existing validity of the contract, and to comply with its terms. It was strongly argued by the plaintiffs' counsel, that Perry, in his conversations with Gen. Adams and Mr. Sibley, did acknowledge that the contract was then operative, and that he intended to perform it. Now it is by no means probable that Perry, after the strong determination to annul it, expressed in his letter of the 8th of April, 1835, adduced in evidence by the plaintiffs, and after having made another agreement with Torrey for the sale to him of the same land, would be willing to revive the Mallory contract. True, he did not express to Gen. Adams or Mr. Sibley, any decided determination to avoid it. That may have been owing to his respect for gentlemen of their high character and standing. Gen. Adams testified that Perry said in substance, (though he did not recollect the exact words,) that he expected to fulfil the contract, but he was some uncertain about it. If the recollection of this witness is correct, there is no positive recognition of the contract. His testimony, too, was given under circumstances which, notwithstanding his unquestioned respectability, do not entitle it to any controling influence. He was interested at the time, and speaks merely of the substance of what was said; and

Wood *v.* Perry.

it is well settled that no great reliance can be placed on such testimony. His memory, too, appears to be very indistinct. He does not recollect whether he tendered the amount then due, ($200,) or the whole consideration money, ($2750.) He says that he cannot state the amount further, than that on the morning when he started, Roraback had a few hundred dollars, (which, according to Roraback's testimony, was not handed to him,) the witness had a few hundred dollars, and he went to a neighbor and got a few hundred dollars more. He, however, states one circumstance which strongly marks the character of what was said and done at this interview—that he determined in the same year to have nothing more to do with the business. There is nothing in the conversation with Mr. Sibley, from which it can be reasonably inferred that Perry at that time recognized the validity of the contract. And the conclusion which Mr. Sibley drew from what was then said, may be inferred from the fact, that, with all his resources, he made no attempt to enforce it during the seven years while it was in his possession. The evidence is by no means sufficient to prove the alleged waiver, and it ought not to be lightly inferred against the party's own interest.

The assignment to Wood was liable to still stronger objections. He was doubtless well informed by his father-in-law of all the circumstances attending the transaction. Besides, he must have seen that the consideration expressed in the assignment was much less than what he paid—in fact merely nominal. And he knew that Sibley refused to make the assignment at all, except on the express condition that he should not implicate himself in any way, or give a remedy back on him, and that there was to be no recourse back to him in any event. All this, coming as it did from an able counsellor, was sufficient to put Wood on his guard. It was said on the argument that Perry had sanctioned the purchase of this contract by Wood, and expressed his determination to give a conveyance under its provisions. To prove this, the plaintiffs introduced Thompson as a witness. He testified that Perry, after giving him instructions relative to the sale of the lands, not based upon, but at

variance with the Mallory contract, directed him to say that if the witness made any bargain binding Torrey to give a deed, if he was satisfied from any information that Torrey was going to make him trouble on the Mallory contract, the deed would be made subject to it; and that he communicated the substance of that conversation to Wood. What was said was based upon the supposition that Torrey might give some trouble. There was no probability of that if a deed was to be given to Wood under a sale effected by Torrey himself. And if there had been any, Torrey could easily have removed it by a release. That, therefore, afforded no good reason for the purchase of the Mallory contract. Neither was there any promise to execute a deed under it on any contingency. Perry could not have intended to revive that, when the effect of it would have been not only to repudiate his contract with Torrey, but to annul the title of Thompson and Godfrey to the land which he had conveyed to them, and made him responsible on his warranty deed for that land. Perry merely declared that if there was any probability of trouble from Torrey on the Mallory contract, his deed would be made subject to it. That could not certainly be tortured into a declaration that the deed would be made *under* it. His sole object was to avoid litigation; not certainly to revive a contract which would cause both trouble and litigation. Had Wood purchased it with a view of extinguishing an outstanding incumbrance, and charging Perry for the consideration money, that would have been well enough. But the facts afforded no excuse for his procuring it with the view of defeating the title under which he had made his purchase, and had entered into and then held possession of the land. That the law would not, and ought not to, tolerate.

The whole history of the transfer of the Mallory contract shows that it was considered by the parties as of at least doubtful validity. It was assigned to Leonard for one dollar, to Roraback for not exceeding twenty-five dollars, to Sibley (as expressed in the assignment to him) for one hundred dollars, and to Wood for two hundred dollars. The last mentioned

sum was all that he gave for what was to transfer to him property, for a part of which, as has been before remarked, he was to pay $3200. But the contract was dead before it was assigned at all. Nothing had occurred to restore its vitality, and Wood was precluded, under the circumstances, from setting it up to defeat the title under which he had purchased and entered into and retained possession of the land in dispute.

The parties are not entitled to any relief in this suit. So far as relates to the Benneys and Palmer, they have undoubtedly made their purchases and expended their money in good faith. If they can prove by competent testimony any valid right to have their contracts fulfilled by the Perrys, they ought to have an opportunity to do so, when freed from their existing connection with Wood. As to Wood, all that he can claim under his contract, if that is valid against Perry, is, to retain possession of the land until he is reimbursed for his expenditures. If he can prove the recognition of his contract by Perry, and that there is any thing due to him for such expenditures, he can avail himself of that defence at law ; and there is no necessity for his resorting to the equity side of this court.

The decree of the late vice chancellor of the seventh circuit must be reversed, the injunctions must be dissolved, and the bill must be dismissed, unconditionally as to Wood, but without prejudice to the rights of the other complainants (whatever they may be) under their contracts with Torrey, and the complainants must pay the costs of the defendant Perry in this suit, including her costs on the appeal.